UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

SARA DELENA,

                              Plaintiff,

              -vs-                                          02-CV-0372C(F)

VERIZON NEW YORK INC.,

                              Defendant.

_____

APPEARANCES:   OFFERMANN, CASSANO, GRECO, SLISZ & ADAMS, LLP
               (JOSEPHINE A. GRECO, ESQ., of Counsel), Buffalo, New York for
               Plaintiff.

               JONES DAY (JAMES S. URBAN, ESQ., of Counsel), Pittsburgh,
               Pennsylvania for Defendant.

## INTRODUCTION

Plaintiff Sara DeLena commenced this action alleging that Defendant Telesector

Resources Group, Inc., d/b/a Verizon Services Group, a/k/a Verizon New York, Inc.

("defendant" or "Verizon") discriminated against her based on her sex, subjected her to a

sexually hostile work environment, and retaliated against her following her complaints of

discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C.

§§ 2000e, *et seq.*, and the New York State Human Rights Law ("NYSHRL"), N.Y.Exec. Law

§ 290, *et seq.* (Item 45).  Presently before the court is defendant's motion for summary

judgment dismissing the amended complaint (Item 66).   In support of the motion,

defendant has filed a Statement of Material Facts (Item 66) with exhibits, and a

Memorandum of Law (Item 68).  Plaintiff has filed an affidavit in opposition to the motion

(Item 71), a Memorandum of Law (Item 72), a Counterstatement of Contested Facts (Item 75), and an attorney's affidavit (Item 74). Defendant filed a reply (Item 77) and affidavit (Item 78).

## BACKGROUND

On July 10, 2001, plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC") alleging that throughout her employment , she had been subjected to different terms and conditions of employment and a hostile work environment because of her sex (Item 75, Exh. Z). Specifically, plaintiff alleged that she was discriminated against based on her sex in the assignment of accounts and personal objectives, performance evaluations, customer positioning events, sales training, technical support, and promotions. Plaintiff also alleged that she was denied a promotion in January 2001. *Id*. According to the charge, plaintiff was retaliated against after she complained of the discrimination to Verizon management. *Id*. The EEOC investigated plaintiff's allegations and issued a Notice of Right to Sue Letter dated March 12, 2002 (Item 45, Exh. 1).

Plaintiff initially brought this action on May 21, 2002, alleging gender-based discrimination in her employment (Item 1). Defendant filed an answer to the complaint on August 1, 2002 (Item 4). On March 30, 2003, plaintiff filed an additional charge with the EEOC. She alleged that she had been subjected to a continuing course of discrimination, harassment, and retaliation since the filing of her initial charge and the filing of her first complaint with this court (Item 75, Exh. II).

After a lengthy period of discovery and several contentious discovery motions (Items 13, 16, 27, 30, 32), plaintiff filed an amended complaint on July 8, 2004 (Item 45).

According to the amended complaint, plaintiff commenced her employment at Verizon in 1988 in the position of Associate Account Executive (Item 45, ¶ 10).  In 1996, she was promoted to the position of Corporate Account Manager.  *Id*., ¶ 11.  Plaintiff claims that throughout her employment, she was subjected to a continuing course of sex-based disparate treatment with respect to the terms and conditions of her employment, required to work in a sexually hostile work environment, and retaliated against for complaining of unlawful discrimination.  *Id.*, ¶¶ 15-17.

Defendant filed an answer to the amended complaint on August 2, 2004 (Item 47). Discovery continued, as did the parties' discovery motion practice (Items 48, 58). Defendant filed its motion for summary judgment on September 30, 2005 (Item 66). Plaintiff filed her response to the motion for summary judgment on November 22, 2005 (Items 71, 72), and also cross-moved for a continuance to permit further discovery (Item 73).  In an order filed August 2, 2006, this court denied plaintiff's motion for a continuance (Item 80).  Oral argument on defendant's motion for summary judgment was heard on September 18, 2006.  For the reasons that follow, the defendant's motion is granted in part and denied in part.

## FACTS[1]

Plaintiff commenced her employment with defendant in 1988 (Item 75, ¶ 11).  In 1995, she was supervised by Michael McGowan.  In 1995, plaintiff attended 29 hours of job-related training, while two male account managers attended only 15 hours.  *Id.,* ¶ 16.

---

[1] This factual statement is taken from the defendant's Statement of Material Facts (Item 66), plaintiff's Counterstatement of Contested Facts (Item 75), and the exhibits in support of each.

In February 1996, plaintiff was promoted to the position of Corporate Account Manager ("CAM"). *Id.,* ¶ 18.  In 1996, account assignments were restructured in the Buffalo office into "industry vertical market segments," with plaintiff given primary responsibility for healthcare accounts (Item 66, ¶ 19).  Plaintiff complained that male CAM James Keller, who was assigned government and education accounts, had better sales opportunities than her and CAM Robert Gauchet, who was assigned financial accounts (Item 75, ¶ 20).  In 1996, plaintiff was assigned a sales objective of $2.1 million, which she surpassed with sales of $3,000,472.66, or 165 percent of her objective.  She earned $96,637.16 in 1996, 4.8 percent less than one male CAM and 26 percent more than the other male CAM.  Item 66, ¶ 23.  In 1996, plaintiff attended 32.75 hours of training, while Keller and Gauchet each received 18.75 hours of training.  *Id.,* ¶ 24.

Plaintiff complained that many of the social events, or "customer positioning events," were sporting events to which customers were not allowed to bring their spouses (Item 75, ¶ 25).  McGowan advised plaintiff that tickets to sporting events were at a premium, and that she should invite a customer and spouse to an event at Shea's Performing Arts Center or to the Buffalo Philharmonic Orchestra.  *Id.*  Plaintiff states that McGowan routinely brought his son to sporting events.  *Id.*

In 1997, three CAMs reported to McGowan–plaintiff, Gauchet, and Michael Finnegan (Item 75, ¶ 27).  Plaintiff was assigned the same accounts that she had in 1996.  She again exceeded her sales objective and was named to the "Masters Club" for sales excellence (Item 66, ¶ 31).  In 1997, plaintiff earned $113,180.51, 16 percent more than one male CAM and 64 percent more than the other.  *Id.,* ¶ 32.  She attended 14 hours of

training, while Gauchet received none.  Finnegan attended 60 hours of training.  *Id.,* ¶ 36.

Plaintiff asked to attend a training session in New York City, but her request was denied.

*Id.,* ¶ 34.  Instead, a decision was made by the General Manager of Branch Operations to

send a data communication manager to New York for the training and have that person

report back to other interested employees.  *Id.,* ¶ 35.  Plaintiff states that sometime during

1997, Finnegan commented during a meeting that someone was "so stupid he could screw

up a wet dream."  (Item 75, ¶ 30).  During that same meeting, during a discussion about

a potential new hire, Finnegan stated it will "depend on what she looks like."  *Id.*

In 1998, the same three CAMs reported to McGowan as in 1997.  Plaintiff was

assigned the same accounts as 1997.  Her sales objective was set at $2.3 million, which

she surpassed with sales of $3.12 million, or 136 percent of her objective (Item, 67, ¶ 40).

She earned the highest rating, "meets/exceeds expectations," and earned $133,076, 20.5

percent more than one male CAM and 72 percent more than the other.  *Id.,* ¶¶ 40-41.

Plaintiff attended 68.75 hours of training.  CAM Finnegan attended 26.25 hours, and

Gauchet attended 28.25.  *Id.,* ¶ 42.

Sometime in 1998 during a telephone conference call, Finnegan asked plaintiff if

she was at home because he could "hear the bed springs creaking" (Item 75, ¶ 39).

Plaintiff complained to McGowan about the comment, and McGowan stated that he would

speak to Finnegan.  *Id.*

In 1999, five CAMs reported to McGowan–plaintiff, Gauchet, Finnegan, Keller, and

Timothy Mitten (Item 66, ¶ 43).  Plaintiff had the same accounts as in 1997 and 1998, and

was reassigned the Erie County government account.  *Id,* ¶ 44.  Her sales objective was

$1.61 million, and she surpassed that goal with sales of $1.639 million, or 102 percent of her goal.  She also received a rating of "meets/exceeds expectations" for 1999.  *Id.,* ¶ 45. Plaintiff earned $97,930.00 in 1999 and was the second highest-paid CAM, earning 25.8 percent less than the highest-paid, 25.6 percent more than the third highest-paid, and 26.2 percent more than the fourth highest-paid CAM.  *Id.,* ¶ 46.  Plaintiff attended 3.5 hours of training, Finnegan attended 39 hours, Keller and Gauchet received none, and Mitten received 66.5 hours of training.  *Id.,* ¶ 47.  Plaintiff states that McGowan denied her requests for more training opportunities (Item 75, ¶ 47).

In 2000, plaintiff reported to McGowan, along with CAMs Keller, Finnegan, and Mitten.  She was assigned a sales objective of $5.37 million (Item 66, ¶ 51).  In December 2000, plaintiff asked McGowan to reduce her objective so that she would attain 100 percent of her goal.  *Id.,* ¶ 60.  Plaintiff's objective was reduced by $680,000.00, she finished at 90 percent of her objective, and she was rated "improvement needed" for the year 2000.  *Id.,* ¶¶ 64-65.  Mitten and Finnegan received more objective relief than plaintiff (Item 75, ¶ 61).  Plaintiff earned $126,077.00 in 2000, 18.9 percent less than one male CAM, 20 percent more than another male CAM, and 63 percent more than the third male CAM (Item 66, ¶ 67).  She attended 48 hours of training, while Finnegan attended 32 hours, Mitten attended 36 hours, and Keller attended 31 hours of training.  *Id.,* ¶ 68.

Plaintiff states that sometime in 2000, Finnegan told plaintiff that she "look[ed] good" and asked her to sit on his lap (Item 75, ¶ 53).  Additionally, at that time, Finnegan began to refer to plaintiff as a "hottie" two or three times per week.  *Id.*  On August 29, 2000, plaintiff received an e-mail from McGowan, in which he told her that she was expected to

6

be in the office until 4:30 unless she was signed out with a customer.  *Id.,* ¶ 54.  Plaintiff admits that McGowan did not raise the issue again, but states that the men in the office ignored the rule.  *Id.,* ¶ 55.  Around Christmas 2000, during a lunch at the Park Lane Restaurant, Finnegan told plaintiff that he asked the restaurant to give plaintiff whipped cream so she could have a "hot time" with her husband that night.  *Id.,* ¶ 63.  Plaintiff also states that McGowan "regularly made comments referring to women as objects."  *Id.*  In 2000, McGowan authorized the purchase of two tickets to a charity auction benefitting Kenmore Mercy Hospital, and plaintiff was provided two tickets to a Shea's gala event.  *Id.,* ¶¶ 56-59.

In 2001, plaintiff reported to McGowan, along with Keller, Mitten, and Gail Williams (Item 66, ¶ 69).  In January 2001, plaintiff applied for a Sales Engineer Manager position that was posted on the Verizon website.  Plaintiff was not interviewed for the position, and was not hired.  *Id.,* ¶ 74.  Dan Irving, a Buffalo-based Sales Engineer, was found to be the most qualified person for the position, possessing supervisory experience, technical competency, and telecommunications industry certifications.  *Id.,* ¶ 74.  Plaintiff admits that Irving possessed supervisory experience at Verizon and industry certifications (Item 75, ¶¶ 75-76).  However, she states that several male candidates with little managerial experience and technical competency were interviewed.  *Id.,* ¶ 81.  The Sales Engineer Manager position was the same level as the CAM position and paid less compensation at the time plaintiff applied (Item 66, ¶ 82).

In early 2001, prior to a meeting at the Jiminy Peak Resort, Finnegan asked plaintiff whether she had a room to herself and, if so, he would come knocking on her door at night

(Item 75, ¶ 70).  Finnegan also commented that he hoped to see plaintiff in the hot tub without a bathing suit.  *Id.*  Finnegan was transferred from the Buffalo office in early 2001, and his comments to plaintiff ceased.  *Id.*  On July 10, 2001, plaintiff filed a charge of discrimination with the EEOC, stating that she was the victim of sexual harassment and a hostile work environment, that she had been subjected to different terms and conditions of employment based on her gender, and that she was wrongfully denied a promotion.  *Id.,* ¶ 86.

In 2001, plaintiff was assigned a sales objective of $5.1 million (Item 66, ¶ 85). McGowan shifted the Erie County account, except for 911 service, to Gail Williams.  *Id.,* ¶ 83.  Plaintiff states that she repeatedly asked to be assigned bank accounts, but her requests were denied, and McGowan transferred the M&T Bank account from Keller to Mitten.  In September 2001, plaintiff was advised that her performance was substandard (Item 75, ¶ 90).  Plaintiff achieved 76 percent of her goal, after it was reduced by $830,000.00.  *Id.,* ¶ 100.  Plaintiff earned $120,621.75 in 2001, the highest salary among the Buffalo-based CAMs who reported to McGowan.  *Id.,* ¶ 101.  She attended 28.5 hours of training, while Mitten and Keller each received 20 hours of training.  *Id.,* ¶ 103.  In September 2001, McGowan authorized the purchase by plaintiff of 10 tickets to the Hope for Tomorrow Foundation fundraiser.  *Id.,* ¶89.

In 2002, plaintiff began to report to Donald C. Donohue (Item 66, ¶ 104).  Donahue assigned a sales objective to plaintiff of $6.5 million, Keller was assigned $9.9 million, and Mitten was assigned $5.6 million.  *Id.,* ¶ 105.  Plaintiff states that in February 2002, Sales Engineer Manager Dan Irving walked up to her, looked at her breasts, and said "hooters."

*Id.,* ¶ 107.   Additionally, plaintiff stated that in 2002, she was subjected to numerous comments that were sexual in nature and created a hostile work environment.   Technical Support Specialist David Winley referred to plaintiff as a "Bond woman" on approximately six occasions and regularly asked about her perfume (Item 75, ¶ 107).   He also told plaintiff that women customers would react badly to her because of the way she looked and dressed.   *Id.*   Plaintiff also states that Donohue told her to start exercising and to see a personal trainer.   *Id.*   Finally, during a meeting in 2002, Sales Engineer Kevin Dean, in response to a customer inquiry whether he worked for plaintiff, told the customer that plaintiff would be working for him before he worked for her.   *Id.*   In April 2002, plaintiff, along with the other CAMs, were placed on a counseling plan which set 30-to-45-day sales objectives (Item 66,  ¶ 109).   Plaintiff successfully completed the plan.   *Id.,* ¶ 110.

Plaintiff took a disability leave from May 16, 2002 until June 17, 2002 (Item 66, ¶ 111).   Plaintiff later asked that her sales objective be adjusted downward to reflect the time off.   *Id.,* ¶ 115.   Donohue told her that the Branch Manager would not adjust the objective for a disability leave.   *Id.,* ¶ 117.   At the end of 2002, plaintiff had met 92.11 percent of her goal and was rated "improvement needed."   *Id.,* ¶ 119.   Mitten was rated "does not meet position requirements" and was advised to find another position within Verizon.   *Id.,* ¶ 120. During 2002, plaintiff attended 75.25 hours of training, compared to 18.26 for Mitten and 32.25 for Keller.   *Id.,* ¶ 122.

In early 2003, defendant hired Ray Brogan to fill the CAM position vacated by Mitten's departure (Item 66, ¶ 123).   Donohue assigned Brogan the M&T Bank account. *Id.*   On March 30, 2003, plaintiff filed another charge with the EEOC alleging discrimination,

harassment, and retaliation.  *Id.,* ¶ 124.  On May 27, 2003, plaintiff commenced a period of short-term disability leave and was off work until July 7, 2003.  *Id.,* ¶ 125.  On August 26, 2003, plaintiff commenced another period of disability leave and was off work for the remainder of 2003.  *Id.,* ¶ 126.  Plaintiff did not return to work during 2004 and was administratively terminated on July 9, 2004.  *Id.,* ¶ 129.

During the course of the litigation, defendant learned that plaintiff underwent elective plastic surgery on May 20, 2002, during the time that she was on short-term disability leave for stress (Item 66, ¶ 136).  On May 15, 2002, plaintiff met with her psychiatrist and complained of stress caused by her work atmosphere.  Specifically, she stated that she was sleeping excessively and that her appetite had decreased.  Her psychiatrist excused plaintiff from work for one month and prescribed Paxil, an anti-depressant.  *Id.,* ¶ 139. Plaintiff began her disability leave on May 16, 2002 and met with Dr. Jeffrey Meilman, a plastic surgeon, that day.  On May 17, 2002, plaintiff went to Kenmore Mercy Hospital for a pre-surgical evaluation.  She advised the nurse that she had no problems with her appetite and sleep and did not disclose that she was taking Paxil.  *Id.*  Pharmacy records indicate that plaintiff did not fill the Paxil prescription.  *Id.*  On May 20, 2002, plaintiff underwent a nose reconstruction and liposuction.  *Id.,* ¶ 139.  Defendant determined that plaintiff had violated its Code of Business Conduct in 2002 by misrepresenting her health condition so that she could collect short-term disability benefits while she underwent and recuperated from elective plastic surgery, and later when she asked that her objective be reduced to account for that time spent on medical leave.  *Id.,* ¶¶ 142, 143.

Plaintiff states that her May 16, 2002 meeting with Dr. Meilman was not scheduled or planned. She visited Dr. Meilman's office on May 16, 2002 to see Dr. Meilman's wife, a personal friend (Item 71, ¶ 127).   At that time, Dr. Meilman's office manager informed plaintiff of a surgical cancellation and asked if she was interested in undergoing a procedure that she had considered for years. *Id.,* ¶ 128. Plaintiff decided to undergo the procedure and admits to having elective surgery on May 20, 2002. However, she states that the surgery was not planned prior to her disability leave. *Id.,* ¶ 130. Plaintiff states that she did not divulge her psychiatric treatment to the nurse during her pre-surgical evaluation because she was embarrassed. *Id.,* ¶ 131. Plaintiff also states that she did not immediately fill the Paxil prescription because she had been given samples by her doctor. *Id.,* ¶ 133.

## DISCUSSION

### 1.  Summary Judgment Standard

Pursuant to Rule 56, summary judgment may be granted only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *SCS Communications, Inc. v. Herrick Co.*, 360 F.3d 329, 338 (2d Cir. 2004). The court will not try issues of fact on a motion for summary judgment, but rather, will determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

Summary judgment is appropriate where the moving party has shown that "little or no evidence may be found in support of the nonmoving party's case.  When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper."  *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223-24 (2d Cir.1 994) (internal citations omitted).  If, however, "'as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper.'"  *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004) (quoting *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir.), *cert. denied,* 517 U.S. 1190 (1996).

The moving party has the burden of showing that there are no material facts in dispute, and the court must resolve all ambiguities and draw all reasonable inferences in favor of the party opposing the motion.  *Bickhardt v. Ratner*, 871 F. Supp. 613 (S.D.N.Y. 1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).  Thus, "[s]ummary judgment may be granted if, upon reviewing the evidence in the light most favorable to the non-movant, the court determines that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law."  *Richardson v. Selsky*, 5 F.3d 616, 621 (2d Cir.1993).

A material fact is one that would "affect the outcome of the suit under the governing law," and a dispute about a genuine issue of material fact occurs "if the evidence is such

that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248.

## 2.  Title VII Statute of Limitations

Verizon argues that most of the incidents of disparate treatment and retaliation[2] of which plaintiff complains of are time-barred because they occurred more than 300 days prior to the filing of her EEOC charge.  Plaintiff acknowledges the 300-day time limitation, but argues that the continuing violations doctrine applies to her Title VII claims because all of the incidents alleged in the amended complaint are part of a pattern and practice of discriminatory conduct.

To maintain an action under 42 U.S.C. § 2000e-5, a plaintiff must ordinarily file a timely charge with the EEOC, receive from that agency a righ-to-sue letter, and commence an action within 90 days of receipt of that letter.  *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 712 (2d Cir. 1996); *Cornwell v. Robinson*, 23 F.3d 694, 706 (2d Cir. 1994).  In New York State, which has its own anti-discrimination laws and enforcement agency, an administrative charge must be filed with the EEOC or the New York State Department of Human Rights within 300 days of the alleged discrimination.  42 U.S.C. § 2000e-5(e); *Harris v. City of New York*, 186 F.3d 243, 247 n.2 (2d Cir.1999).

"The timeliness of a discrimination claim is to be measured from the date the claimant had notice of the allegedly discriminatory action." *Van Zant*, 80 F.3d at 713 (citing *Morse v. Univ. of Vermont*, 973 F.2d 122, 125 (2d Cir. 1992)).  The 300-day filing requirement "functions as a statute of limitations," *Quinn v. Green Tree Credit Corp.*, 159

---

[2]  Verizon does not challenge the timeliness of the hostile work environment allegations.

F.3d 759, 765 (2d Cir. 1998), and is strictly construed in this circuit. *See, e.g., Trenchfield v. DuPont Photomasks, Inc.*, 1997 WL 53238, *6 (S.D.N.Y. Feb. 07, 1997) (Title VII claims filed with the EEOC 338 days after alleged discriminatory employment practice dismissed as untimely); *Van Zant v. KLM Royal Dutch Airlines*, 870 F. Supp. 572, 575 (S.D.N.Y.1 994) (sexual harassment and retaliation claims dismissed as time-barred where last alleged discriminatory act was 315 days before EEOC filing). Moreover, the Supreme Court recently reiterated its view that "'strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law.'" *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 108, (2002) (quoting *Mohasco Corp. v. Silver*, 447 U.S. 807, 826 (1980)).

Here, it is undisputed that plaintiff filed her charge with the EEOC on July 10, 2001 (Item 16, Exh. B). Accordingly, any alleged incidents of discrimination occurring before September 13, 2000 are time-barred under Title VII. *See Miller v. New York City Health & Hosp. Corp.*, 2004 WL 1907310, *3 (S.D.N.Y. Aug. 25, 2004) ("An incident that was not charged to the EEOC or DHR within 300 days of its occurrence is time-barred."). The NYSHRL imposes a three-year statute of limitations which is measured from the filing of the action in court. *See* N.Y.C.P.L.R. § 214(2). Accordingly, under the NYSHRL, plaintiff's claims which occurred prior to May 21, 1999 are time-barred.

Plaintiff argues that the continuing violation doctrine works to save her untimely allegations because many of the acts at issue are a part of a pattern and practice of discriminatory conduct toward women within the Buffalo Office of the Enterprise Sales Group of Verizon. "The 'continuing violation' doctrine holds that an act that occurs within

14

300 days of an EEOC charge may implicate–and therefore make timely–incidents otherwise outside of the mandatory filing deadlines." *Miller*, 2004 WL 1907310, at *3 (citing *Morgan*, 536 U.S. at 114-21). "[A] continuing violation may be found where there is proof of specific ongoing discriminatory policies or practices, or where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice." *Cornwell v. Robinson*, 23 F.3d at 704.

It is well settled that "multiple incidents of discrimination, even similar ones, that are not the result of a discriminatory policy or mechanism do not amount to a continuing violation." *Lambert v. Genesee Hosp.*, 10 F.3d 46, 53 (2d Cir. 1993), *cert. denied,* 511 U.S. 1052 (1994) (citations omitted). Thus, discrete acts of discrimination or retaliation, such as termination, failure to promote, denial of transfer or refusal to hire, constitute separate unlawful employment practices which are actionable only to the extent that each occurred within the appropriate time period. *Morgan,* 536 U.S. at 114. "There is simply no indication that [invoking] the term 'practice' converts related discrete acts into a single unlawful practice for the purposes of timely filing." *Id.* at 111; *see also, Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 907 (2d Cir. 1997) (repeated demotions and failure to adequately compensate not sufficient for continuing violation theory); *Gross v. National Broadcasting Co.*, 232 F. Supp. 2d 58, 68 (S.D.N.Y. 2002) ("The holding in *Morgan* is in accord with Second Circuit law which states that alleged failures to compensate adequately, transfers, job assignments and promotions cannot form the basis for a continuing violation claim.").

Here, accepting the truth of plaintiff's allegations and resolving all inferences in her favor, she does not allege, nor is there any inference of, an ongoing discriminatory policy or practice.  *See Bailey v. Colgate-Palmolive Co.*, 2003 WL 21108325, *9 (S.D.N.Y., May 14, 2003), *aff'd*, 93 Fed.Appx. 321 (2d Cir. 2004) (failure to set forth discriminatory policy or mechanism, such as discriminatory seniority lists or employment tests, is fatal to application of the continuing violation doctrine).  Similarly, there is no indication that related instances of discrimination were permitted to continue unremedied for so long as to amount to a discriminatory policy or practice.  Plaintiff's allegations involve unrelated, discrete acts.  In sum, the continuing violation doctrine does not save the amended complaint's untimely allegations.  To the extent that plaintiff's disparate treatment and retaliation claims under Title VII are premised on employment decisions occurring prior to September 14, 2000, they are time-barred.  Additionally, her NYSHRL claims based on allegations of discriminatory conduct which occurred on or before May 21, 1999 are time-barred.

### 3.  Failure to Exhaust Administrative Remedies

Verizon argues that plaintiff failed to exhaust her administrative remedies with regard to all claims set forth in her amended complaint because she did not first present those claims to the EEOC.  Plaintiff argues that all of the allegations in her amended complaint are "reasonably related" to the claims raised in her EEOC charge.

Ordinarily, a plaintiff commencing a Title VII action must exhaust her administrative remedies by first presenting her claims to the EEOC.  *Bailey v. Colgate-Palmolive Co.*, 2003 WL 21108325, at *12.  Failure to do so defeats the purpose of Title VII's statutory

notice provision, which is "to encourage settlement of discrimination disputes through conciliation and voluntary compliance . . . . ." *Miller v. Int'l Tel. & Tel. Corp.*, 755 F.2d 20, 26 (2d Cir.), *cert. denied*; 474 U.S. 851 (1985); *Burnett v. ESL Fed. Credit Union*, 198 F. Supp. 2d 307, 314-15 (W.D.N.Y. 2002).   Consequently, courts routinely dismiss unexhausted Title VII claims.  *Bailey,* 2003 WL 21108325, at *12 (citing cases).

However, "filing a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling." *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982).  The Second Circuit has held that "'as a general matter, the failure to exhaust administrative remedies is a precondition to bringing a Title VII claim in federal court, rather than a jurisdictional requirement.'" *Francis v. City of New York*, 235 F.3d 763, 768 (2d Cir. 2000) (quoting *Gibson v. West*, 201 F.3d 990, 994 (7th Cir. 2000)); *see also, Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 n. 5 (2d Cir. 2000); *Pietras v. Bd. of Fire Comm'rs of the Farmingville Fire Dist.*, 180 F.3d 468, 474 (2d Cir. 1999).  Thus, the requirement can be waived by the litigants or the court.  *Zipes*, 455 U.S. at 393; *Pietras,* 180 F.3d at 474.

Moreover, under some circumstances, courts may entertain claims that, while not expressly raised in the underlying administrative charge, are "reasonably related" to it.  *See Butts v. City of New York Dep't of Hous. Pres. & Dev.*, 990 F.2d 1397, 1401 (2d Cir. 1993), *superseded by statute on other grounds as stated in Hawkins v. 1115 Legal Servs. Care*, 163 F.3d 684, 693 (2d Cir. 1998).  In *Butts*, the Second Circuit discussed three situations where unexhausted claims may be "reasonably related" to properly presented claims: (1)

"where the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination;" (2) where the "claim is one alleging retaliation by an employer against an employee for filing an EEOC charge" and (3) "where a plaintiff alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge." *Butts,* 990 F.2d at 1402-03 (quotations and citations omitted).

In this case, plaintiff filed her first charge with the EEOC on July 10, 2001.  It read as follows:

> I began working for NYNEX, now known as Verizon, in August 1988 as an Associate Account Executive.  Throughout my employment and continuing to the present, I have been subjected to different terms and conditions of employment than similarly situated male employees and have been sujected (sic) to sexual harassment and a hostile work environment.  The different terms and conditions of employment include, but are not limited to; assignment of accounts, assignment of personal objectives, performance evaluations, attainment of objectives, customer positioning events, sales training, technical support, and promotions.  The latest time I was denied a promotion was in January 2001.  The hostile work environment has included many comments and conduct which were offensive and sexual in nature.  I have made complaints of sexual discrimination, sexual harassment and a hostile work environment to management but management has failed to take effective steps to correct the situation.  Instead, I have been retaliated against because of my complaints of sexual discrimination, sexual harassment and a hostile work environment.  The sexual discrimination, sexual harassment, hostile work environment and retaliation are part of a pattern of sex discrimination by Respondent which violates Title VII of the Civil Rights Act of 1964.

(Item 75, Exh. Z).  Plaintiff also appended an eight-page "Supporting Affidavit" to her EEOC charge in which she detailed her allegations that accounts were distributed in a discriminatory manner, that social events were "largely male oriented," that she was expected to sign in and out of the office unlike her male counterparts, that she was treated in a demeaning manner because of her sex, that she was denied a promotion based on

18

her sex, and that she was subjected to the offensive comments of Michael Finnegan and others. *Id.*

On March 30, 2003, plaintiff filed an additional charge with the EEOC. In it, she stated:

> I filed a Charge of Discrimination with the EEOC against Verizon New York, Inc., (hereinafter "Verizon") on or about July 10, 2001, which I incorporate herein by reference. I commenced a federal court action by filing a Summons and Complaint with the United States District Court, Western District of New York on March 21, 2002, which I incorporate herein by reference. Since that time, I have been subjected to a continuing course of discrimination, harassment, and retaliation by Verizon, and its agents, servants, and/or employees. Members of management of Verizon, including but not limited to, my direct supervisor, who is the Regional Sales Manager, and the General Manager of Business Sales, have retaliated against me, harassed me, subjected me to a hostile work environment, and continued to subject me to different terms and conditions of employment. Some of such acts are as follows: placing me on a counseling plan; continuing to discriminate with respect to the assignment of accounts, personal objectives, performance evaluations, adjustment of objectives, sales training, technical support and promotions; and subjecting me to or not disciplining other employees for subjecting me to inappropriate sexual and discriminatory remarks. I have made complaints of sexual discrimination, sexual harassment, a hostile work environment, and retaliation to my managers, but the conduct has not stopped. Instead, I have been retaliated against because of my complaints of sexual discrimination, sexual harassment, a hostile work environment, and retaliation. The sexual discrimination, sexual harassment, hostile work environment, and retaliation are a part of a pattern of sex discrimination by Respondent which violates Title VII of the Civil Rights Act of 1964.

(Item 75, Exh. II). Again, plaintiff appended a nine-page "Supporting Statement" to the charge, detailing her allegations of discriminatory assignment of accounts, retaliatory actions, and inappropriate comments. The supporting statement includes dates, locations, and specific perpetrators of the alleged discrimination and retaliation. *Id.*

Defendant argues that plaintiff's claims should be dismissed because the EEOC charges were insufficient to permit a meaningful investigation and response by the EEOC.

In a case brought against Verizon by a different plaintiff, in which the same boilerplate language was used as in the EEOC charge here, United States District Judge William M. Skretny dismissed the hostile work environment claims, stating that the "allegations of hostile work environment in the amended complaint are not reasonably related to [plaintiff's] EEOC charge where she couched her hostile work environment claim in vague generalities devoid of any factual basis." *Byrne v. Telesector Resources Group, Inc.*, 2005 WL 464941, *10 (W.D.N.Y. February 25, 2005). Similarly, Judge Skretny found that the plaintiff's allegations of retaliation in *Byrne* "were not articulated to the EEOC in a manner that would allow for a meaningful response." *Id.*

The EEOC has established interpreting regulations that specify the requisite information that must appear in a "charge." *See* 29 C.F.R. §§ 1626.3, 1626.6, 1626.8. The required content is minimal. For instance, a charge "is sufficient" when the EEOC receives "a . . . written statement" (or information that an EEOC employee reduces to a writing) from the person making the charge that names the employer and generally describes the allegedly discriminatory acts. *See id.*, § 1626.8(b). According to the regulations, a charge also "should contain," but is not required to contain, other information such as the full contact information for the employer and the individual filing the charge, and a "clear and concise statement of the facts, including pertinent dates, constituting the alleged unlawful employment practices." *See id.*, § 1626.8(a)(1)-(5).

The Supreme Court has not directly addressed the question of whether a written submission to the EEOC that is not on an EEOC charge form is an EEOC charge. *See Edelman v. Lynchburg Coll.*, 535 U.S. 106, 118 (2002) (declining, in a case involving Title

20

VII, to reach the question of whether or not claimant's filing of unsworn statement to EEOC constituted a "charge").  However, the Second Circuit has held that "a writing submitted to the EEOC containing the information required by EEOC interpreting regulations is an EEOC 'charge' for purposes of Section 626, only when the writing demonstrates that an individual seeks to activate the administrative investigatory and conciliatory process." *Holowecki v. Federal Exp. Corp.*, 440 F.3d 558, 566-67 (2d Cir. 2006), *cert. granted,* 127 S.Ct. 2914 (June 4, 2007).  Additionally, the court stated that "notice to the EEOC must be of a kind that would convince a reasonable person that the grievant has manifested an intent to activate the Act's machinery."  *Holowecki*, 440 F.3d at 567 (quoting *Bihler v. Singer Co.*, 710 F.2d 96, 99 (3d Cir.1983)).

Here, while the first page of the plaintiff's EEOC charge contains the boilerplate language found insufficient by Judge Skretny in *Byrne,* the supporting statements appended to the charges filed in 2001 and 2003 provided the EEOC with sufficient factual detail to permit meaningful response and investigation.  Taken together, the charge form and the supporting statements contain the information required by the EEOC regulations and demonstrate plaintiff's intention "to activate the administrative investigatory and conciliatory process."  *Holowecki*, 440 F.3d at 567.  Accordingly, the court concludes that plaintiff's EEOC charges with the additional supporting statements satisfied the exhaustion requirements of Title VII.

**4.  Disparate Treatment and Retaliation**

Defendant contends that plaintiff has failed to present a prima facie case of disparate treatment and/or retaliation.[3]  Specifically, defendant argues that plaintiff was not adversely impacted by her work assignments, training opportunities, performance reviews, or customer positioning events in comparison to similarly situated male CAMs. Additionally, defendant argues that all employees, including male CAMs, were closely scrutinized and criticized by Verizon management.  Finally, defendant argues that the Sales Engineering Manager position that plaintiff sought was a lateral move for which a more qualified male applicant was hired.

In the context of a summary judgment motion, the court must analyze both the disparate treatment and retaliation claims using the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (noting application of *McDonnell Douglas* burden shifting framework to discrimination cases); *see also Wilson v. New York City Dept. of Transp.*, 2005 WL 2385866, at *15 (S.D.N.Y. Sept. 28, 2005) (citations omitted) (noting disparate treatment and retaliation claims brought under Title VII are analyzed under *McDonnell Douglas* burden shifting framework).[4]  At the outset, plaintiff has the burden of "proving by the preponderance of the evidence a prima facie case of discrimination."  *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U .S. 248, 252-53

---

[3]  While several alleged instances of disparate treatment and retaliation are time-barred, the court has examined plaintiff's claims under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

[4]  When considering claims brought under the NYSHRL, the court employs the same analysis it uses in Title VII cases.  *Cruz v. Coach Store, Inc.*, 202 F.3d 560, 565 n.1 (2d Cir. 2000).

(1981).  To establish a prima facie case of gender-based disparate treatment, plaintiff must show that (1) she belongs to a protected class; (2) she was performing her duties satisfactorily; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred in circumstances giving rise to an inference of discrimination on the basis of her membership in that class.  *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004).  Similarly, to make out a prima facie case of retaliation, an employee must show that (1) the employee was engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered adverse employment decisions; and (4) there was a causal connection between the protected activity and the adverse employment action. *Collins v. New York Transit Auth.*, 305 F.3d 113, 118 (2d Cir. 2002); *see also Wilson*, 2005 WL 2385866, at *16 (citing *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996)).  Plaintiff's initial burden is *de minimis*.  *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 467 (2d Cir.), *cert. denied,* 534 U.S. 993 (2001).

If a plaintiff establishes a prima facie case, the burden shifts to the defendant to provide a legitimate, non-discriminatory reason for the challenged action. *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003); *see McDonnell-Douglas Corp. v. Green*, 411 U.S. at 802.  If defendant succeeds in making this showing, the burden then shifts back to the plaintiff to point to evidence indicating that the employer's non-discriminatory explanation is merely pretextual; if the plaintiff does not meet this burden, the defendant is entitled to summary judgment.  *Joseph v. Leavitt*, 465 F.3d 87, 90 (2d Cir. 2006), *cert. denied,* 127 S.Ct. 1855 (2007) (quoting *James v. New York Racing Ass'n*, 233 F.3d 149, 153-54 (2d Cir. 2000)).

Plaintiff is a member of a protected class and has shown that she was performing the duties of her job in a satisfactory manner.  Defendant argues that plaintiff has not shown that she suffered an adverse employment action.  In order to establish that an adverse employment action resulted from a defendant's alleged discrimination, a plaintiff must demonstrate a materially adverse change in the terms and conditions of employment.  *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000). To be materially adverse, a change in working conditions must be

> more disruptive than a mere inconvenience or an alteration of job responsibilities.  A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation.

*Galabya v. New York City Bd. of Educ.*, 202 F.3d at 640 (citations and internal quotation marks omitted); *accord DeMoret v. Zegarelli,* 451 F.3d 140, 151 (2d Cir. 2006); *Patrolmen's Benevolent Assoc. v. City of New York*, 310 F.3d 43, 51 (2d Cir.  2002), *cert. denied,* 538 U.S. 1032 (2003).  Thus, for example, an adverse employment action is not established by proof of excessive work, denials of requests for leave with pay and a supervisor's general negative treatment, *Fridia v. Henderson*, 2000 WL 1772779, *7 (S.D.N.Y. Nov. 30, 2000), or by evidence of being yelled at, receiving unfair criticism, or receiving unfavorable schedules or work assignments.  *Katz v. Beth Israel Med. Ctr.*, 2001 WL 11064, *14 (S.D.N.Y. Jan. 4, 2001).  In considering plaintiff's retaliation claims, the court notes that the "adverse employment action" standard is somewhat different than in discrimination clams.  In *Burlington N. & Santa Fe Ry v. White,* ___U.S.___, 126 S.Ct. 2405, at 2415 (2006), the Supreme Court stated that a retaliatory action is "materially

adverse" if "it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination."

In response to plaintiff's allegation that she was assigned low-revenue accounts and high sales objectives, defendant has presented proof that plaintiff was the top earner among her fellow CAMs in 1997, 1998, and 2001 and was second in earnings in 1996, 1999, and 2000, finishing above male CAMs (Item 66, ¶¶ 23, 32, 41, 46, 67, 101).  While plaintiff contends that the accounts were assigned in a discriminatory manner, the record indicates that accounts were assigned in industry vertical segments in 1996, with plaintiff given primary responsibility for healthcare accounts.  It is undisputed that plaintiff was highly successful with the accounts she was assigned and was not adversely affected by the account assignment.  Plaintiff argues that she may have earned even more money had she been assigned a banking account as she requested and that she would not have had to work as hard had she been assigned a smaller number of larger accounts. However, plaintiff's dissatisfaction with the account assignment does not establish a materially adverse employment action.  Moreover, even if the court were to find that plaintiff has presented a prima facie case of discrimination with regard to the assignment of accounts, defendant has offered proof that accounts were assigned in a nondiscriminatory way, with plaintiff receiving primary responsibility for health care accounts.  It is apparent from plaintiff's earning history that defendant assigned accounts in such a way as to provide each CAM with the potential to meet his or her objective and earn a competitive salary.  Accordingly, the court finds that plaintiff has failed to offer proof that defendant's account assignments were pretext for discrimination, and this claim is dismissed.

Additionally, defendant contends that plaintiff has failed to show that she was subjected to heightened scrutiny based on her sex, as male CAMs were also closely supervised, put on counseling plans, and given unfavorable performance reviews.  In August 2000, McGowan advised plaintiff by e-mail that she was expected to be in the office until 4:30 unless she was signed out for a customer visit.  *Id.,* ¶ 54.  Plaintiff admits that McGowan never raised the issue again.  *Id.,* ¶ 55.  She has presented no proof that this policy was applied to her in a discriminatory manner and has failed to show that the application of the policy resulted in an adverse employment action against her.  From 1996 to 1999, plaintiff received satisfactory performance evaluations and, in 1997, was named to the "Masters Club" for sales excellence.  *Id.,* ¶ 31.  In 2000, plaintiff was rated "improvement needed," while male CAM Finnegan was rated "does not meet position requirements" and was demoted.  *Id.,* ¶¶ 65-66.  In September 2001, male CAM Mitten was placed on a performance improvement plan while plaintiff was not, although she too did not reach her sales objective.  *Id.,* ¶ 91.  In May 2002, all CAMs were placed in a Counseling Session, which plaintiff successfully completed.  *Id.,* ¶¶ 109-10.  At the end of 2002, plaintiff was rated "improvement needed," while Mitten was rated "does not meet position requirements" and was advised to find another job.  *Id.,* ¶¶ 119-20.  While reprimands and close monitoring may cause an employee anxiety, "such intangible consequences are not materially adverse alterations of employment conditions."  *Cramer v. Fedco Automotive Components Co.,* 2005 WL 839671, *11 (W.D.N.Y. April 12, 2005) (quoting  *Castro v. New York City Bd. of Educ. Personnel*, 1998 WL 108004, *7 (S.D.N.Y. Mar. 12, 1998)).  Similarly, to the extent that plaintiff has alleged that the monitoring of her

performance was done in retaliation for her protected activity, it cannot be said that such monitoring, which applied to male employees as well, would dissuade a reasonable employee from engaging in protected activity.

Plaintiff also alleges that social events were "male-oriented," thus denying her the opportunity to entertain customers.  In response, defendant notes that such events are for the benefit of customers and are not based on the tastes and interests of its employees.  Defendant allowed plaintiff to take a customer and his wife to a Shea's Theater gala, and defendant purchased tickets to a Kenmore Mercy Hospital Foundation charity auction (Item 66, ¶¶ 56-59).  Plaintiff has offered no proof to establish that customer positioning events were offered in such a way as to discriminate against female employees.  Finally, plaintiff contends that she was denied training opportunities based on her gender.  Plaintiff has offered nothing to refute defendant's proof that she was generally provided as much training or more than male CAMs.  *Id.,* ¶¶ 24, 36, 42, 47, 68, 103, 122.  Accordingly, plaintiff has failed to show that she suffered an adverse employment action, under either standard, and has failed to establish a prima facie case of discrimination or retaliation with regard to assignment of accounts and objectives, performance reviews, customer positioning events, and training opportunities.

With respect to plaintiff's claim that she was denied a promotion in 2001,[5] defendant has offered proof that the Sales Engineer Manager position was a Level 2 management position, the same level as the CAM position, that paid less than plaintiff's CAM position.  Refusal to move an employee into a lateral position at the same or less

---

[5]  Plaintiff's allegation of failure to promote in 1996 is time-barred.

27

pay is not an actionable adverse employment action under Title VII.  *Greaves v. St. Luke's/Roosevelt Hosp. Center,* 2005 WL 627635, *5 (S.D.N.Y. Mar. 17, 2005); *Dunphy v. Delta Airlines, Inc.*, 290 F. Supp. 2d 311, 315 (S.D.N.Y. 2003).  Plaintiff disputes that this would have been a lateral move, as the Sales Engineer Manager position involved supervisory responsibilities and offered the potential of advancement.  Even crediting plaintiff's contention that the position was not a lateral move and assuming that plaintiff has presented a prima facie case, she nonetheless has failed to raise a genuine issue of fact with regard to her claim of discriminatory or retaliatory failure to promote.

To establish a prima facie case of discriminatory failure to promote, plaintiff must show that (1) she is a member of a protected class; (2) she applied for and was qualified for a job for which the employer was seeking applicants; (3) she was rejected for the position; and (4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications. *Brown v. Coach Stores, Inc.,* 163 F.3d 706, 709 (2d Cir. 1998).  While plaintiff is a member of a protected class, defendant disputes that she was qualified for the Sales Engineer Manager position, having found that Daniel Irving, the man eventually hired for the position, was the "only candidate in [the] applicant pool [who] achieved the skill sets required to perform the . . . position."  Item 66, ¶ 76; Item 67, Exh. Q.  Plaintiff contends that she should have been granted the courtesy of an interview and complains that her application was not seriously considered, yet she concedes that Irving demonstrated technical competency as a Sales Engineer, possessed industry certifications, and, unlike her, had supervisory experience at Verizon.  Assuming that plaintiff has established a prima facie case of discriminatory or retaliatory failure to promote, defendant has offered a legitimate non-discriminatory reason for its decision to

28

hire Irving as the Sales Engineer Manager.  The court has reviewed the employment applications of both plaintiff and Irving (Item 67, Exhs. P, R).  Irving was employed as a Sales Engineer, held a Bachelor's degree in Information Technology and was working on a Master's degree in the field.  He had supervisory experience at Verizon and superior technical experience and knowledge.  Plaintiff has failed to present any evidence indicating that the defendant's reasons behind the hiring decision were a pretext for discrimination.  Accordingly, summary judgment is warranted on plaintiff's claim of failure to promote.

### 5. Hostile Work Environment

Plaintiff alleges that she was subjected to a hostile work environment based on her gender.  In order to prevail on a gender discrimination claim based on a hostile work environment theory under Title VII, a plaintiff must show: "(1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of ... her work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer."  *Petrosino v. Bell Atl.*, 385 F.3d 210, 221 (2d Cir. 2004) (citations and quotations omitted); *see also Alfano v. Costello,* 294 F.3d 365, 373 (2d Cir. 2002) (citation omitted)).

"The first element of a hostile work environment claim has both an objective and subjective component: 'the misconduct must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive.'" *Petrosino*, 385 F.3d at 221 (quoting *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003)); *see also Harris v. Forklift Sys., Inc.*, 510 U.S.

29

17, 21 (1993), *abrogated on other grounds by Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 753 (1998).   To maintain a hostile work environment claim, plaintiff "'must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment.'"   *Alfano*, 294 F.3d at 374 (quoting *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir.2000)); *accord Harris*, 510 U.S. at 21; *Thomas v. New York City Health & Hosps. Corp* ., 2004 WL 1962074, at *12 (S.D.N.Y. Sept. 2, 2004) ( as a general rule, isolated instances of name-calling and offensive remarks alone are ordinarily not severe enough to alter the conditions of employment).   Whether the environment may be considered sufficiently hostile or abusive to support a hostile work environment claim is to be measured by the totality of the circumstances, including (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether the conduct was physically threatening or humiliating, or a "mere offensive utterance;" (4) whether the conduct unreasonably interfered with plaintiff's work; and (5) what psychological harm, if any, resulted to the plaintiff.   *See Harris v. Forklift Sys., Inc.*, 510 U.S. at 23.   The factors outlined above must be considered "cumulatively," so that the court can "'obtain a realistic view of the work environment.'"   *Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) (quoting *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 444 (7th Cir. 1994)). This includes evaluating the "quantity, frequency, and severity" of the incidents.   *Id.*

With respect to the imputation requirement, the general rule is that "[w]hen harassment is perpetrated by the plaintiff's coworkers, an employer will be liable if the plaintiff demonstrates that 'the employer either provided no reasonable avenue for

complaint or knew of the harassment but did nothing about it.'" *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997) (quoting *Karibian v. Columbia Univ.*, 14 F.3d 773, 780 (2d Cir.), *cert. denied*, 512 U.S. 1213 (1994)); *accord Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 72 (2d Cir. 2000).  In addition, "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998).  An employee is deemed to possess supervisory status if he has "the authority to affect the terms and conditions of the victim's employment."  *Mack v. Otis Elevator Co.*, 326 F.3d 116, 126 (2d Cir.), *cert. denied*, 540 U.S. 1016 (2003).

Defendant characterizes the plaintiff's allegations as "a handful of temporally remote comments" (Item 68, p. 32) and argues that the inappropriate comments made by Finnegan and other male CAMs were not sufficiently pervasive and severe so as to alter the terms and conditions of plaintiff's employment.  Plaintiff alleges that Finnegan made rude comments during a meeting in 1997, and suggested that her bed springs were creaking during a telephone conference call in 1998.  In 2000, Finnegan asked plaintiff to sit on his lap and began to refer to plaintiff as a "hottie." In December 2000, Finnegan made the suggestion that plaintiff take home whipped cream from a restaurant, and in 2001, Finnegan said that he hoped to see plaintiff in the hot tub without a bathing suit. Plaintiff also complains that McGowan made degrading comments about women and that other male employees commented on her looks and grooming.

The court recognizes that the comments, which began in 1997 and continued throughout her employment, were generally rude and inappropriate, but they were not physically threatening.  Crediting plaintiff's allegations, she points to at least seventeen incidents of unwelcome comments, insults, or sexually offensive conduct over the course of approximately six years, and the regular use of insulting nicknames and offensive comments over that period of time.  While "[i]solated, minor acts or occasional episodes do not warrant relief," *Brennan v. Metropolitan Opera Assoc., Inc.,* 192 F.3d 310, 318 (2d Cir. 1999), the court finds that the harassing incidents alleged here were sufficiently repeated and continuous.  Additionally, while defendant contends that the offensive comments did not interfere with plaintiff's work performance, plaintiff did not meet her sales objectives in 2000, 2001, and 2002, and she took disability leave in both 2002 and 2003 because of the stress of her work environment.  Plaintiff alleges that she complained to her supervisor regarding Finnegan's comments, but Finnegan, in his deposition testimony, denied ever having been counseled for his behavior by management (Item 75, Exh. K, p. 158).  Considering all of the comments, including those of Finnegan as well as those of other male employees, the court is unable to say that a reasonable trier of fact would not find that plaintiff was subjected to a hostile work environment based on her gender.  Accordingly, defendant's motion for summary judgment dismissing this claim is denied.

## 6. Limitation on Plaintiff's Damages

Finally, defendant argues that should plaintiff's claims survive summary judgment, her damages should be cut off as of August 2004, when she would have been terminated

for violating Verizon's Code of Business Conduct.  Defendant contends that plaintiff took a disability leave so that she could undergo and recuperate from cosmetic surgery, misrepresenting her health condition, fraudulently taking disability benefits, and seeking a reduction in her sales objective based on her disability leave.

The court has examined the proof in support of and in response to defendant's argument, and concludes that questions of fact remain regarding the motivation behind plaintiff's disability leave and the whether plaintiff could have been terminated for cause.  Accordingly, at this time, plaintiff's damage claim will not be extinguished as of August 2004.

## CONCLUSION

Based on the foregoing, defendant's motion for summary judgment is granted in part and denied in part.  The motion is granted with respect to the disparate treatment and retaliation claims, but denied with respect to plaintiff's hostile work environment claim. The court will conduct a telephone conference with counsel on Thursday, November 1, 2007, at 10:45 a.m. to set a date for trial of the hostile work environment claim.

So ordered.

_____\s\ John T. Curtin_____
JOHN T. CURTIN
United States District Judge

Dated:  October   9    , 2007
p:\pending\2002\02-372.may907

33